THE BOARD OF COMMISSIONERS OF WYANDOTTE COUNTY
*et al.* v. THOMAS J. BARKER.

1. COUNTY ROADS—*Improvement—Requisite Petition—Jurisdiction.* Under chapter 214, Laws of 1887, "An act providing for the improvement of county roads," the petition required by section 1 must be signed by a majority of the resident land-holders within one-half mile on either side of a regularly laid out road, within the terminal points mentioned, or the board of county commissioners acquires no jurisdiction to order the improvement prayed for.

2. JURISDICTIONAL DEFECT—*Tax-Payer, When Not Estopped.* A tax-payer is not estopped from asserting a jurisdictional defect in the assessment proceedings, when he had no knowledge of the defect at the time the proceedings were instituted, nor until after the work had been commenced.

*Error from Wyandotte District Court.*

ACTION to restrain the collection of a certain tax. Judgment for plaintiff *Barker*, at the September term, 1889. The defendant *County Board* and others bring the case here. The opinion states the material facts.

*J. B. Scroggs, J. O. Fife, A. L. Berger,* and *Winfield Freeman,* for plaintiffs in error.

*Hutchings & Keplinger,* for defendant in error.

Opinion by SIMPSON, C.: This is a petition in error filed by the board of county commissioners and others, plaintiffs in error, to reverse one of the findings and a part of the judgment of the district court made in the case. The action was commenced by the defendant in error, Barker, under § 253 of the code, to enjoin the collection of certain taxes and special assessments levied upon his land under the pretended authority of chapter 214, Laws of 1887, being "An act providing for the improvement of county roads." We have considered some of the findings and rulings in the preceding case, *Barker v. Comm'rs of Wyandotte Co.,* ante, p. 681, that the plaintiff below brought here for review. At the trial below, the court

found as follows .as to the improvement of the Quindaro boulevard:

"2. The petition for the improvement of the Quindaro boulevard was, on the 3d day of June, 1887, presented to the board of county commissioners of said county, and upon presentation of such petition, the commissioners ordered a survey, map, and profile and specifications to be made and filed by the county surveyor, which were all made and attached together, properly authenticated by the signature of the county surveyor; and the map and profile offered in evidence are the ones and only ones made by the county surveyor, and by him filed with the board of county commissioners, relating to said Quindaro boulevard improvement.

"3. Afterward the county commissioners appointed S. S. Sharpe, G. W. Bishop and R. M. Gray commissioners to take charge of said improvement. On January 8, 1888, said Sharpe resigned, he having been in the meantime elected county commissioner, and W. E. Connelley was appointed by the commissioners in his place, and afterward Bishop and said Connelley resigned, and the county commissioners appointed T. L. Higgins and James Squires in their places.

"4. Said commissioners were all properly qualified, except G. W. Bishop, who resigned before any considerable portion of the work of said improvement was begun.

"5. The plaintiff lived upon his land just south of the Quindaro boulevard, and his land abuts thereon. He was residing at his said home all the time the improvements were being made upon all the streets mentioned, and was thoroughly familiar with the manner in which the construction of said improvement was carried on, and knew that his land was within the half-mile limit, and would be assessed to pay for such improvement under said law of 1887.

"6. There were within the half-mile limit between the termini mentioned in the petition, along said Quindaro boulevard, twenty-one resident land-holders at the time of the presentation of the petition for the improvement of the said road. Only five of said resident land-holders signed the petition which was presented to the board of county commissioners, and upon which said board acted in ordering said improvement to be made and constructing the same.

"7. The petition for the improvement of Quindaro boulevard was presented to plaintiff for signature, but he did not sign the same; and it nowhere appears in evidence that he

knew who did sign it, or that it was not signed by a major-
ity of the resident land-holders within the territory taxed,
until after said improvement was completed.

"8. The map filed by the county surveyor included a tri-
angular strip of ground on the south side of the road im-
proved, at its junction with Fifth street, which was not within
the half-mile limit, and excluded a similar tract on the north
side of said Quindaro road at the same junction, which was
within the half-mile limit.

"9. The map also excluded a small tract of land which
was within the half-mile limit and lying south of the road, in
a triangular form, and at that time within the city limits of
Kansas City, as appears from the map; and also excluded a
piece of land of about forty acres, used as a cemetery, and
marked 'Woodlawn,' lying within said limits; and the com-
missioners on each of the improvements mentioned excluded
said last-mentioned tract in making up their apportionments.

"10. It does not appear that the plaintiff knew what lands
were included or excluded from said map.

"11. The profile filed by the county surveyor showed the
grade line of the road, and the commissioners in making the
improvement made some slight deviations from such grade
line, but such deviations did not in any manner injure the
road, and to some extent reduced the cost of the improvement.
Whatever change was made was at the request of the plain-
tiff, Barker.

"12. The contract for the work was made by the commis-
sioners for a foundation of one-inch cypress plank, and the
work was constructed with one-inch cypress plank foundation.

"13. Plaintiff knew what the petition called for, and also
the kind of plank that was being used during all the work
from the beginning.

"14. The precise day upon which the road commissioners
made their apportionment does not appear from the evidence,
but upon June 14, 1888, they caused to be published a notice,
of which the following is a copy:

"'The board appointed to assess the benefits to property for grad-
ing and blocking of Quindaro boulevard have made their apportion-
ment, and will meet the property-owners interested at the office of the
county clerk, on Monday, Tuesday, and Wednesday, June 18th, 19th,
and 20th, at 9 A. M.        [Signed]        R. M. GRAY, *Chairman.*
          T. L. HIGGINS, *Secretary.*'

"Which notice was published for one week in the official
county paper, and is the only notice shown by the evidence to
have been given by the said commissioners either before or

after making their apportionment. Upon June 18, 1888, the said commissioners met, and their minutes show the following entry:

"'JUNE 18, 1888.—The board having finished the apportionment of benefits, and having advertised the same in the official county paper, met, as per said notice, as a board of equalization, and to hear complaints, if any are to be made, from property-owners, and after remaining in session all day, adjourned until to-morrow, June 19th.

[Signed] T. L. HIGGINS, *Secretary.*
R. M. GRAY, *Chairman.*'

"Said board was in session for the purposes mentioned in the foregoing entry each day thereafter until June 23d following, when it adjourned finally as a board, and the same day filed its report with the county clerk, together with all books and papers possessed by it relative to said improvement. Each day's entry in the minutes of its proceedings was signed by the chairman and secretary, and the last by all the board, as was also a paper delivered to the county clerk, which purported to be the final action of the board.

"15. The improvement upon Quindaro boulevard was well constructed and of good material, and was of great value to the property-owners within the half-mile limit, and enhanced the value of all such lands to an amount greater than the tax assessed against it for such improvement."

"36. By reason of the improvement of the boulevard, Tenth, Fifth, and Third streets, all that belt of country lying immediately south of the boulevard and between Ninth and Third streets, in which tract the land of plaintiff lies, has been made easy of access upon paved streets, has been greatly enhanced in value, and since said improvements were made has been more rapidly developed than any portion of Kansas City, owing largely to such improvements."

According to the sixth special finding, only five of the twenty-one resident land-holders that were within the half-mile limit between the termini mentioned for improvement signed the petition. It was this finding, in all probability, that induced the trial court to conclude that the petition for the improvement of Quindaro boulevard was void, and conferred no jurisdiction upon the board of county commissioners to make the improvement; that no sufficient facts have been shown to create an estoppel as to the plaintiff, and that the temporary injunction should be made perpetual as to tax for the improvement of Quindaro boulevard.

The findings and conclusions as to this boulevard are claimed to be erroneous, and it is said in support of this contention that the statute confers upon the resident land-holders *only* the right to petition, and when the petition is presented, the board of county commissioners exercises the same powers as it is authorized to exercise under the provisions of the general road laws. It is further said, that the insufficiency of the petition cannot be urged in this action, as it is a collateral attack.

The first section of the act requires in positive terms —

"That whenever a majority of the resident land-holders within one-half mile on either side along the line of any regularly laid out road, within the terminal points mentioned in the petition, shall petition the board of county commissioners of any county in this state for the improvement of any road as located, or any part thereof, it is hereby made the duty of such county commissioners to cause the same to be improved as hereinafter provided."

It would seem, on principle, that the requirement of this statute that a majority of the resident land-holders within the the limit must sign the petition for improvement, is not only imperative and must be always complied with, but the power of the board to order the improvement cannot be exercised unless the petition contains the names of that majority. The best reason for this is, because the statute says so, and if you once depart from the plain letter of the act, and say that five land-holders out of twenty-one can compel action by the board, then any number less than a majority may do so.

The position assumed by counsel for these plaintiffs in error with reference to this question is this: That under the first section of the act the board of county commissioners has the power to determine whether or not the petition was signed by a majority of the resident land-holders within the half-mile limit; that in this particular instance it exercised that power, and determined that the petition was signed by such majority, and that this finding cannot be attacked collaterally

in this proceeding.  Numerous cases decided by the supreme court of the state of Indiana are cited that fairly support this contention.  The case of *Quinlan v. Myers*, 29 Ohio St. 500, is a formidable authority in their favor.  They also cite the case of *Sleeper v. Bullen*, 6 Kas. 300, and call attention to the following language of the court:

"Is the city liable?  We think it is.  The petition appears to be good upon its face.  The city council, the agents of the city, and in whom is confided the province of deciding the question, decided and declared that the petition was good and valid, and now, after the contract has been executed on the part of the contractors, after the grading has all been done, the city is estopped from denying the validity of the contract or its liability to the contractors for the grading."

When this case is carefully examined, it will be seen that this language was used by the court with reference to a controversy between the city and the contractors, and has no application to the question of the validity of the petition as between a lot-owner, whose lot was assessed, and the city. The case was commenced by Sleeper, and many others, against the city of Leavenworth and the city treasurer, to restrain the collection of a special tax assessed to pay for making certain local improvements on Fifth avenue, in the city of Leavenworth, alleging that there had not been any legal or proper petition presented to the city council praying for the improvements to be made, and that for the want of such petition, the taxes levied to pay for the same were illegal and void.  Subsequent to the filing of the plaintiff's petition, Bullen and Dustin, the contractors who made the improvements, were made parties on their own motion, and in their answer they claimed that their contract was made with the city in good faith, and in ignorance of the facts respecting the petition; that they had performed and completed the contract; that their work had been accepted by the city, and demanded judgment against the city for the amount due them for making the improvements.  The trial court found —

"That a petition for grading Fifth avenue between certain

points had been signed by the requisite number of property-owners affected thereby, and while said petition was in the custody of the city council, and without the consent of a majority of the property-owners residing upon and owning the property to be taxed to pay for such improvement, it was changed by one of the signers, by striking out the words 'the north line of Tanner's farm,' and inserting the words 'Fanny street, or where the grade will run out through the hill at Sigel Garden.'"

Other facts were found, and the court held that the ordinance for grading Fifth avenue and the assessments made thereunder were void, and created no lien against the abutting property. This court, in reviewing the case, says:

"The first question in the case is whether the contract with Bullen and Dustin, and the special tax levied to pay them for said grading, were legal? We think that they were not legal, for the reason that no sufficient petition was ever presented to the city council. It therefore follows that said city had no legal right to sell said lots for said special taxes."

The court then considers a third question in the case, as to whether the city is liable to the contractors for the grading, and uses the language quoted in the brief and relied upon by counsel for plaintiffs in error. There is no question in this case between the contractors and the county: the question here is between a land-holder and the board of county commissioners and treasurer. The first point in the syllabus of the Sleeper case is:

"A contract made by the city council, under chapter 70, Laws of 1876, for grading a street in Leavenworth city, without a sufficient petition having first been presented to the council, is, and all proceedings under such contract are, void as against lot-owners."

The case as we take it is authority for two propositions: First, that the board of county commissioners acquired no jurisdiction to cause the Quindaro boulevard to be improved, on account of the insufficiency of the petition. Second, the petition is subject to a collateral attack in cases like this.

In the case of *Noffzigger v. McAllister*, 12 Kas. 315, this

45 — 45 KAS.

court says that the county commissioners of Bourbon county had no authority to make an order putting the night herd law in force in a township, without a petition from a majority of the qualified electors of the township asking for the same; that the petition is a jurisdictional fact, and without it no valid order can be made. The order of the board recited that a petition had been presented by a majority of the qualified electors of the township. In this case there was a collateral attack.

The cases of *Comm'rs of Wabaunsee Co. v. Muhlenbacher,* 18 Kas. 129, and *Shaffer v. Weech,* 34 id. 595, are both to the effect that the requirement that the requisite number of resident land-holders must sign the petition is a jurisdictional one; that it is a precedent condition, and a failure to comply with it will make all subsequent proceedings void.

The general rule applicable to such inferior jurisdictions as boards of county commissioners is, that in their proceedings they are to be held to the strict limits of their authority as conferred and prescribed by statute. We are confident that the rule held and applied by this court is, that the land-holder can show in a collateral action the want of jurisdiction of the county board to order the improvement, unless he has so placed himself by acts or words as to be equitably estopped from so doing. The trial court finds as a conclusion of law that no sufficient facts have been shown to create an estoppel as to Barker in the matter of the Quindaro boulevard. The special findings of fact upon which this conclusion is based are the fifth, seventh, and thirty-sixth. The fifth shows that Barker was familiar with the manner in which the construction of said improvements was made, and knew that his land was within the half-mile limit, and would be assessed to pay for such improvement, under the law of 1887. The thirty-sixth shows that, by reason of the improvement of the boulevard and other streets, the land of the plaintiff was made easy of access upon paved streets, and has greatly enhanced its value. The seventh finds that the petition for the improvement of the boulevard was presented to Barker for signature, but he

did not sign it, and that it is not shown that he knew who did sign it, or that it was not signed by a majority of the resident land-holders within the territory taxed, until after the said improvement was completed. In our judgment this finding is conclusive against the contention of counsel for the plaintiffs in error, that Barker is estopped from asserting the jurisdictional defect in the petition for the improvement of the boulevard. Giving to the plaintiffs in error the benefit of the most favorable reported cases, yet it is almost universally held that, in order to estop a tax-payer from objecting to a jurisdictional defect, he must have known of such defect at the time it occurred, or discovered it before the work was commenced. (Am. & Eng. Encyc. of Law, 20, and citations in foot-notes.) Indeed, the rule is stated very much stronger than this in the case of *City of Leavenworth v. Laing*, 6 Kas. 274. The other findings do not recite sufficient facts to create an estoppel.

*2. Jurisdictional defect—tax-payer, when not estopped.*

We recommend that the findings and judgment of the trial court as to the boulevard be affirmed.

By the Court: It is so ordered.

All the Justices concurring.